# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| Mark Freund | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 17 CV 50064 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Freund was a welder who injured his back on the job sometime in 2011. After the injury, his back pain gradually worsened and he underwent various treatments over the next several years to alleviate the pain. These included injections, physical therapy, and, eventually, the implantation of a dorsal column stimulator. Despite some improvement, plaintiff claims that he still cannot walk, stand, or sit for any significant period. He applied for disability benefits. The administrative law judge ("ALJ") agreed that plaintiff was unable to return to his welding job, where he had lifted 100 pounds, but found that he could do light work. In reaching this decision, the ALJ relied on the hearing expert who testified that the objective evidence indicated only mild problems and that an April 2014 functional capacity evaluation showed that plaintiff could do medium level work, albeit for only six hours a day. Based on these and other factors, the ALJ concluded that plaintiff lacked credibility. Plaintiff seeks a remand, arguing that the ALJ's credibility analysis was flawed and that the ALJ ignored an opinion of plaintiff's treating physician. This Court agrees that a remand is warranted.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

**BACKGROUND**

The following summary is only a general background and does not include all of the medical visits or tests. The relevant treatment period runs from early 2012 until the middle of 2015. During this time, plaintiff's care was overseen by his primary care physician, Dr. Dennis Norem. After plaintiff's back injury, Dr. Norem issued a series of "off work" notes every few months stating that plaintiff was unable to return to his welding job. The assumption seems to have been that plaintiff's back problem might improve with treatment so that he could return to his welding job. But on September 5, 2013, Dr. Norem wrote that it "appears [that plaintiff] is not going to be able to return to the kind of physical activity he has been doing." R. 419. In addition to the "off work" notes, Dr. Norem wrote a "To Whom It May Concern" letter on September 16, 2014. This letter is the main document evidencing Dr. Norem's opinion, and it states as follows:

> Mark Freund is a patient of mine whom I have followed for the past several years. He has a history of significant back pain. He has been thoroughly assessed by neurosurgery and pain management and he has undergone extensive therapy. He is unable to return to his occupation due to his chronic back pain. He continues to have significant discomfort, limited range of motion and is unable to do any significant lifting, bending or standing. At this point I consider his disability permanent and I do not expect this to improve.

R. 724.

As alluded to in the letter, plaintiff was treated at the Rockford Pain center beginning in February 2012. Doctors recommended a variety of treatments. Dr. Gahl performed multiple epidural steroid injections, an SI injection, and a radiofrequency ablation. Dkt. #9 at 2. Plaintiff participated in several physical therapy programs. As described in the ALJ's decision, plaintiff at one point "completed seven weeks of therapy in a five-hour per day, five days a week conditioning program." R. 23. Doctors prescribed numerous medications, including gabapentin,

hydrocodone, and ambien. Dkt. #9 at 2. The Court need not summarize all the details here, but it should be noted that these efforts were fairly extensive. For example, at the hearing, Dr. Slodki, gave the following summary of the injections plaintiff received:

> What I found in the record was the following injection procedures. He had Cottle steroid injection on 1/22/15, lumbar epidural steroid injections 6/8/16, Cottle steroid injection 2/19/[15?], lumbar epidural steroid injections 3/27/15, lumbar epidural steroid injection 5/7/15, facet injections 2/9/13, sacroiliac injections 12/26/13, radiofrequency ablation 4/23/13, and trigger point injection procedures injections 12/7/13 and 2/30/13, so that completes the injection procedures that I found. I'm sure I missed a few.

R. 51.[2] As described in Dr. Norem's letter, plaintiff also consulted with a neurosurgeon, Dr. Roh, who concluded that surgery would not be a good option to address plaintiff's problems.

On October 2, 2013, plaintiff consulted with Dr. Dahlberg, also at the Rockford Pain Center, about a dorsal column stimulator implant. In the "History of Present Illness" section, Dr. Dahlberg wrote the following, which provides an overview of plaintiff's treatment history:

> Mr. Freund is a very pleasant 36-year-old white male who is well known to our practice. I am seeing him for the first time today in consultation for possible dorsal column stimulator implant. This patient's chief complaint is of low back and left lower extremity pain. This has been ongoing for just over 2 years. Apparently it was preceded by an injury at work. The patient has been followed by my partner, Dr. Gahl, after being referred by Dr. Roh and Dr. Norem. Dr. Roh did not feel that there was anything surgically to be done for his low back and has sent him to Dr. Gahl who has tried multiple different injections as well as multiple different medications for management of his low back and left lower extremity neuropathic pain. Despite this, the patient's pain continues to progressively worsen.

R. 442.

A hearing was held on October 15, 2015. Plaintiff testified that his last job, as a welder of drive chains, was "very, very heavy work" that required standing and walking most of the day. R. 39. He injured his back on this job, and there was a worker's compensation claim pending. The ALJ observed that plaintiff had "tried a number of [] different kinds of treatment" that

---
[2] A few of the dates appear to be incorrect, but the precise timing of the injections is not relevant here.

included "pain medications, physical therapy, injections, a [dorsal] column stimulator." R. 41. The ALJ asked whether the dorsal column stimulator had helped, and plaintiff answered as follows:

> It does on some basis. It helps me most when I'm laying down flat in bed and I turn it up high, but [they've] been having issues where they have to reprogram it about every two weeks now, but I'm still [] seeing the guy that reprograms, I've got to go see him again tomorrow [] to try and do a different programming to see if that works a lot better. It's hard to have it on when I'm walking around because it moves a little bit there, and it raises the frequency up and down too much, and it's up in my rib cage, and it hurts.

R. 41-42. The ALJ asked about surgery, and plaintiff stated that doctors thought that there was only a "50-50 shot if it would work" and that it could "make [his] situation worse." R. 42. Plaintiff stated that he still had pain "all the time," and that he was in bed "most days." R. 43. Sitting was hard for any long period. He estimated that he could walk between 100 and 200 yards until he would have to stop and lean on something. He sometimes needed help from his mother to get dressed, and there were days when he did not take showers because he could not get out of bed and sometimes could "just barely get out of bed to use the restroom." R. 45. He was "on 10 different medications." R. 47.

Dr. Sheldon Slodki testified next.[3] He first observed that there were references in the medical records to "failed back syndrome" but noted that this seemed to be an error because there was no evidence plaintiff ever had surgery. Dr. Slodki noted that plaintiff was "on a broad range of significant medication," and was "[d]ependent on pain medication." R. 51-52. The dependence was iatrogenic. When the ALJ asked what that meant, Dr. Slodki stated that it "means the doctors did it, usually." R. 51. He did not elaborate.

After the above testimony, Dr. Slodki distilled the case down to the following: "This is primarily a pain case, and credibility is the major issue, and the commissioner determined

---
[3] According to his resume, Dr. Slodki is board certified in internal medicine and cardiovascular disease. R. 729.

credibility." R. 52. Dr. Slodki provided the following proposed residual functional capacity ("RFC") evaluation:

> I believe that he probably should be able to do light [work] based on the objective evidence in the record. The [functional capacity evaluation] actually indicated modified medium. [] As I indicated, his primary disability is secondary to pain. I do not determine credibility. I only go by the objective evidence in the record.

R. 53.

On cross-examination, plaintiff's counsel focused on the functional capacity evaluation ("FCE"), asking about its conclusion that plaintiff could only work six hours total in one day. Dr. Slodki answered that he took a "global approach" and did not use the FCE as the "only indicator" for his conclusion. R. 54. He agreed that the FCE was a little "confus[ing]" in the way it was written up. *Id.* He focused on the finding that plaintiff was at a "very high-level" in his ability to "lift and carry from floor to waist." *Id.* Counsel finally asked about plaintiff's extensive treatments. Dr. Slodki reiterated his conclusion that this case turned on credibility and stated that he could only opine on the objective evidence. R. 56. He stated that the MRI findings were not severe and noted that "surgery was not recommended as a treatment modality." *Id.*

On December 8, 2015, the ALJ issued his decision finding plaintiff not disabled. The ALJ found that plaintiff could perform a range of light work that required standing or walking six hours or sitting four hours (including 50 minutes at a time). The ALJ gave considerable weight to Dr. Slodki's testimony and to the opinion of two State agency physicians. The ALJ rejected the Dr. Norem's opinion because it was vague and inconsistent with other evidence. The ALJ found that plaintiff was not credible for several reasons discussed below.

## DISCUSSION

Plaintiff argues that the ALJ failed to follow the treating physician rule and erred in the credibility analysis. The Court begins with the latter argument because, like Dr. Slodki, it finds

5

that the case rests heavily on the credibility analysis given that the objective evidence alone cannot provide a definitive answer.

I.  **The Credibility Analysis.**

The ALJ's credibility analysis is set forth below:

> The claimant's allegations are less than credible because the objective medical evidence of record does not support the alleged severity of his impairment. In addition, records reflect that routine and conservative treatments and medications have improved the claimant's condition. There has been no surgery recommendation and there are no medical opinions that the claimant is unable to work[,] only opinions that the claimant cannot return to his prior occupation, which involved lifting up to 100 pounds. Of interesting note are records indicating the claimant has post laminectomy syndrome and failed back surgical syndrome which are diagnoses used for persons who have undergone back surgery but records do not reflect the claimant having ever had back surgery and claimant testified he is not a candidate for back surgery.

R. 24. Although several rationales are set forth in this paragraph, plaintiff argues that the dominant one was the lack of objective evidence. There is no doubt that this rationale was important. It was listed first. Dr. Slodki's testimony focused mostly on it. If the lack of objective evidence were the sole rationale, then the ALJ's credibility analysis would not be sufficient. As set forth in SSR 96-7p, pain allegations "may not be disregarded solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"); *Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays.").

Given that the ALJ offered some additional rationales aside from the lack of objective evidence, the ALJ arguably did not "solely" rely on this one rationale. But upon closer analysis, the ALJ's other rationales are either unclear or lack substantial evidence to support them. The above paragraph lists four additional rationales: (i) routine treatment; (ii) no surgery recommendation; (iii) no supporting medical opinion; and (iv) the observation about failed back syndrome. The Court will discuss each individually.

**Routine Treatment.** The ALJ concluded that plaintiff only had "routine and conservative treatments and medications" and that they collectively "improved plaintiff's condition." This rationale rests on two assertions, neither of which are adequately supported.

The first assertion is not backed by any medical opinion. Dr. Slodki never testified that plaintiff's treatments were routine and conservative. The Government in its brief does not try to defend this conclusion either. Dr. Norem specifically opined that plaintiff had undergone "extensive" therapy. It could perhaps be argued that certain treatments considered in isolation, such as physical therapy and maybe even injections, were routine and conservative. But plaintiff engaged in many such treatments over an extended period. Notably, he then had a dorsal column stimulator implanted. This treatment was utilized because Dr. Dahlberg concluded that "all conservative measures" had been tried. R. 441. This comment suggests that, at a minimum, the stimulator was *not* viewed as routine or conservative. As for medications, none of the doctors suggested that plaintiff's use of ten medications, including norco and gabapentin, was routine and conservative. In fact, Dr. Slodki observed that plaintiff was taking a "broad range of significant medication." This, again, does not fit the picture of conservative treatment.

In sum, rather than counting *against* plaintiff, this treatment history should have counted *in his favor*. See, e.g., *Heeman v. Astrue*, 414 Fed. Appx. 864, 868 (7th Cir. 2011) ("As we

7

commented in *Carradine*, what is significant here (as there) is the improbability that Heeman would have undergone all the procedures he did, including the trial insertion of a spinal stimulator, his physical therapy, and his heavy medications, just to create the impression that he was experiencing pain."); *Goble v. Astrue*, 385 Fed. Appx. 588, 591 (7th Cir. 2010) ("We have deemed it improbable that a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking."); *see also Israel v. Colvin*, 840 F.3d 432, 434 (7th Cir. 2016) ("Under the care of various doctors and specialists, Israel tried physical therapy, transcutaneous electric nerve stimulation (also called "TENS"), a dorsal column stimulator, epidural injections, narcotic pain medications including Methadone and morphine, lidocaine patches to block nerves from sending pain signals, a muscle relaxer, an antidepressant known to help with chronic pain, and drugs used for nerve pain."). SSR 96-7p provides the following statement that is apt here:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

Unlike many disability cases, where claimants ignore or inconsistently follow doctor recommendations, plaintiff was praised by his doctors for his perseverance and diligence. Dr. Gahl stated that "this gentleman has done *absolutely everything* we have asked him to over the years." R. 740 (emphasis added); *see also* R. 443 ("he has been an excellent patient").

8

The ALJ's second assertion—that the treatments led to improvement—was not adequately analyzed. Again, Dr. Slodki never opined that plaintiff had improved because of his treatments. Plaintiff's doctors also did not suggest that plaintiff had significant improvement. Dr. Dahlberg noted that all conservative measures had "failed." R. 441. It is true, as the ALJ noted, that plaintiff at times stated that certain treatments helped for a while. But the ALJ did not fully consider all the evidence on this point and relied on a cherrypicked conclusion that some improvement occurred. For example, the ALJ noted that plaintiff reported 80% improvement after implantation of the dorsal stimulator. R. 23. But as plaintiff notes, the ALJ left out the fact that this statement was made fairly soon after the procedure and that plaintiff stated a few months later that the stimulator only provided 60% relief and that he was told to continue taking norco and participating in the physical therapy program. Dkt. #9 at 3. Also, the ALJ never analyzed plaintiff's daily activities, which is one of the factors under SSR 96-7p. These activities also suggested that any improvement obtained by plaintiff was relatively modest. As described above, he testified that he could not get out of bed some days to take a shower and had trouble getting to the bedroom. The ALJ's conclusion about improvement was vague. The critical unresolved issues are how much improvement occurred and whether it was stable and longlasting. Like the Seventh Circuit in *Israel*, this Court finds that the current record "present[s] an unclear picture of the effectiveness of various treatments for his persistent pain." 840 F.3d at 441. On remand, more attention should be given to this issue.[4]

**Surgery.** The ALJ and Dr. Slodki both noted that no doctor recommended surgery. This is true, but the Court does not understand why this undermines plaintiff's credibility. Plaintiff

---

[4] One issue is whether the stimulator device, assuming it did provide significant improvement, could still provide that relief while plaintiff was doing the active labor of a medium work job. Plaintiff testified that walking around made the device less effective. Another issue is how consistent it was in providing relief. Plaintiff testified that it had to get it reprogrammed every two weeks, suggesting that its effectiveness varied.

9

consulted with an orthopedist, Dr. Roh, who advised him *not* to have surgery because it likely would not help and could make things worse. The unproven premise in the ALJ's argument is that there was some surgery available that would correct the problem. Neither Dr. Slodki, nor the ALJ, identified any viable option. As such, it is not fair to judge plaintiff for this fact.

**No medical opinion.** The ALJ noted that there were no medical opinions that supported plaintiff's claim that he could not return to any work, as opposed to not being able to return to his heavy lifting welding job. This argument glosses over Dr. Norem's opinion, which is discussed below. Whatever criticism could be made about this opinion, it is clear that Dr. Norem believed plaintiff's allegations. There is likewise no suggestion that any of plaintiff's other treating doctors doubted his pain allegations. The ALJ's statement about no supporting medical opinion gives the misleading impression that plaintiff's doctors doubted him.

**Failed Back Syndrome.** The ALJ's last credibility rationale is more of an observation, rather than a developed argument. The ALJ called it merely an "interesting note." It is not clear whether this was truly an anomaly (Dr. Slodki mentioned this point but did not rely on it) or, even if it were an anomaly, why it should count as a negative mark on plaintiff's credibility. This would seem to be a question more relevant to the credibility of some of plaintiff's doctors.

In sum, these four credibility rationales are not adequate, leaving the lack of objective evidence as the sole reason explicitly identified in credibility analysis. The Court acknowledges that, elsewhere in the decision, the ALJ also relied on the results of the FCE and argued that it also supported the decision.[5] This piece of evidence thus potentially adds a separate rationale, making this case not just solely about the lack of objective evidence. But the Court finds that the

---

[5] There was also an earlier FCE, in August 2013, which is briefly referred to by Dr. Gahl. But there is no copy of the FCE results, making it questionable whether any weight can be placed on this document. Additionally, the results of the earlier FCE are limited because plaintiff reported to Dr. Gahl that he had a "considerable increase in pain" for three days after the FCE. R. 443.

FCE, at least as currently analyzed by the ALJ, contains too many ambiguities. The FCE presents a mixed picture, with some points favoring plaintiff and some favoring the ALJ's interpretation. Dr. Slodki himself found it to be confusing in places, and even derided it as being based on only subjective statements by plaintiff. Also, Dr. Slodki focused on plaintiff's lifting abilities from the test, but as plaintiff notes, it is not clear that these abilities would be relevant to his standing abilities. The FCE found that plaintiff could only sit one hour in the day, whereas the ALJ found that he could sit four hours. In light of all these questions, the Court is not persuaded that this ambiguous FCE is enough to overcome the prior conclusion that the ALJ's credibility rationale relied too much on the conclusion that there was not supporting objective evidence.

II.     **The Treating Physician Rule.**

Plaintiff's second argument is that the ALJ failed to follow the treating physician rule in rejecting Dr. Norem's opinion as set forth in the "To Whom It May Concern" letter. This Court agrees. As a matter of procedure, the ALJ did not explicitly apply the six checklist factors. As explained in earlier opinions, this Court takes the view that an explicit analysis is required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). The Government does not dispute this conclusion but instead basically argues that there was an implicit analysis of the factors. However, the Court does not find that the ALJ's analysis was adequate. Because this Court has already concluded that a remand is required based on the first argument, the Court will address this one more briefly.

The ALJ's main reason for giving no weight to Dr. Norem's letter was that it was "vague" about how long plaintiff could do various activities, for example standing, during the workday. The ALJ is correct, to an extent. Dr. Norem did not provide hourly estimates, but merely stated that plaintiff had "significant" limitations. Plaintiff argues that the ALJ is being

nitpicky in requiring precise wording and argues that it is fair to assume that Dr. Norem did not believe that plaintiff could do the hourly amounts of sitting, standing, or walking as envisioned by the RFC. This may be true, but there is still some uncertainty given the use of the word significant. For this reason, on remand, plaintiff should ask Dr. Norem if he would complete an RFC questionnaire. That would eliminate any potential ambiguity.

In addition to faulting Dr. Norem's letter for being vague, the ALJ's other main argument was that it was inconsistent with the two State agency opinions, with Dr. Slodki's testimony, and with the FCE. This rationale implicates the third and fourth checklist factors (supportability and consistency) and thus is an important topic to consider. But the Court finds that the ALJ's explanation, which consists of a short paragraph, is vague and conclusory itself and provides no evidence or explanation behind it. The ALJ suggested that Dr. Norem's opinion was an outlier, but the ALJ relied on a limited summary of the record. Specifically, the ALJ did not acknowledge that Dr. Norem's opinion was in line with the observations and diagnoses of both Dr. Gahl and Dr. Dahlberg at the Rockford Pain Center. As noted above, Dr. Dahlberg found plaintiff to be generally credible and believed that the non-conservative treatment of a spinal column stimulator was warranted.

The ALJ's analysis is also incomplete. The ALJ did not address the first, second, and fifth checklist factors, all of which tend to favor plaintiff. The first and second factors (length and nature of the treatment relationship) were not considered by the ALJ. Dr. Norem treated plaintiff since at least 2011. Dkt. #11 at 2. He oversaw the referral to the Rockford Pain Center. He thus had a longitudinal perspective. In short, he had the advantages of a treating physician. *See Israel*, 840 F.3d at 437 ("We give more weight to the opinions of treating physicians because they are most familiar with the claimant's conditions and circumstances."). Similarly, Dr. Gahl

12

saw plaintiff multiple times and observed that plaintiff was generally "well known" to the doctors at the Rockford Pain Center. R. 442. This suggests that they too had a good familiarity with plaintiff and his condition. By contrast, Dr. Slodki only heard plaintiff's testimony on one occasion, and the State Agency physicians never saw plaintiff.

As for the fifth factor (degree of specialization), it tends to support plaintiff's case. Dr. Slodki specialized in internal medicine and cardiovascular disease. On the other side of the ledger, plaintiff's pain was evaluated by two doctors specializing in pain. On the issue of whether surgery was warranted, plaintiff was assessed by an orthopedist. Dr. Slodki's opinion, and the ALJ's decision, implicitly question the judgments of these professionals. Considering the expertise of the treating doctors, the balance tips in plaintiff's favor. *See Israel*, 840 F.3d at 438 ("we note that Israel's treating physician is a specialist in the area of pain management, and the non-examining opinions came from internists with no special training or expertise as to pain."). But the ALJ gave no consideration to this factor. This is another reason why it is important for ALJs to conduct an explicit analysis of the factors.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: June 15, 2018                    By: _____
                                           Iain D. Johnston
                                           United States Magistrate Judge

13